## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ERIC B. FROM, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 18-78-SRF |
| | ) |
| NANCY A. BERRYHILL, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

## I. INTRODUCTION

Plaintiff Eric B. From ("From") filed this action on January 10, 2018 against defendant

Nancy A. Berryhill, the Acting Commissioner of the Social Security Administration (the

"Commissioner"). From seeks judicial review pursuant to 42 U.S.C. § 405(g) of the

Commissioner's November 15, 2017 final decision, denying From's claim for disability

insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§

401-434 and §§ 1381-1383f. This court has jurisdiction over the matter pursuant to 42 U.S.C. §

405(g).[1]

Currently before the court are From's and the Commissioner's cross-motions for

summary judgment. (D.I. 10; D.I. 16) From asks the court to remand his case for further

administrative proceedings. (D.I. 11 at 19) The Commissioner requests the court affirm the

Administrative Law Judge's ("ALJ") decision. (D.I. 17 at 20) For the reasons set forth below,

---

[1] The parties consented to the jurisdiction of a magistrate judge to conduct all proceedings in this
matter through final judgment and the case was assigned to the undersigned judicial officer on
July 23, 2018. (D.I. 15)

From's motion for summary judgment is denied (D.I. 10), and the Commissioner's cross-motion for summary judgment is granted.[2] (D.I. 16)

## II. BACKGROUND

### A. Procedural History

From protectively filed an application for DIB on February 27, 2014, alleging a disability onset date of May 31, 2013. (D.I. 8-2 at 16) The claim was initially denied on June 27, 2014, and denied again after reconsideration on November 19, 2014. (D.I. 8-4 at 2-6, 8-12) From then filed a request for a hearing, which occurred on October 12, 2016. (D.I. 8-2 at 35) On February 9, 2017, Administrative Law Judge C. Howard Prinsloo issued an unfavorable decision, finding that From was not disabled under the Act because he retained the residual functional capacity ("RFC") to perform medium work,[3] including past relevant work as a mechanic supervisor.[4] (*Id.* at 16-27) The Appeals Council subsequently denied From's request for review on November 15, 2017, rendering the ALJ's decision the final decision of the Commissioner. (*Id.* at 2-6) On January 10, 2018, From brought a civil action in this court seeking review of the ALJ's decision. (D.I. 1) On May 14, 2018, From filed a motion for summary judgment, and on August 13, 2018, the Commissioner filed a cross-motion for summary judgment. (D.I. 10; D.I. 16)

---

[2] The briefing for the present motion is as follows: plaintiff's opening brief (D.I. 11), the Commissioner's combined opening brief in support of her motion for summary judgment and answering brief (D.I. 17), and plaintiff's reply brief (D.I. 18).

[3] The ALJ defined "medium work" according to 20 C.F.R. § 404.1567(c) with the exception of climbing ladders, ropes, or scaffolds; work at unprotected heights; and only occasional overhead reaching. (D.I. 8-2 at 21)

[4] The ALJ refers to From's previous work as a "mechanic supervisor," but From described his previous work as a "maintenance supervisor." (*Compare* D.I. 8-2 at 26 *with* D.I. 8-2 at 38)

2

## B. Medical History

The ALJ concluded that From has the following severe impairments: degenerative disc disease, degenerative joint disease, and obesity. (D.I. 8-2 at 18) From was born on April 26, 1957, and was fifty-six years old on his alleged onset date. (D.I. 8-6 at 12) From graduated high school and completed one year of college. (D.I. 8-2 at 38) He has a prior work history as a maintenance supervisor, a part-time position at the YMCA, a deliveryman for Advanced Auto Parts, and an auto parts salesman for Rhino Lining. (*Id.* at 38-40, 50-52)

### 1. Physical Impairments

On January 13, 2012, From had an x-ray of his left knee, which showed slight degenerative joint space narrowing medially. (D.I. 8-8 at 9) On June 14, 2012, From visited his treating physician, Dr. Oswaldo A. Nicastro ("Dr. Nicastro")[5] and reported mild to moderate knee pain. (*Id.* at 6) Dr. Nicastro noted that the onset had been gradual, but persistent for months. (*Id.*) From experienced knee pain since 1999 following a knee surgery for a meniscal tear. (*Id.*) From stated that he experienced a dull aching pain that was aggravated by physical activity and movement. (*Id.*) From continued to complain of knee pain in March 2013. (*Id.* at 42) When he visited Dr. Nicastro on March 27, 2013, Dr. Nicastro noted that the onset of pain was sudden and persistently recurring. (*Id.*) From described his knee pain as moderate to severe in his entire knee. (*Id.*) Dr. Nicastro noted "joint swelling, medial pain, lateral pain, instability, pain under patella, and painful [range of motion]." (*Id.*)

On March 14, 2014, From reported worsening neck pain. (*Id.* at 71) This neck pain continued through May 2014, when From stated that the pain radiated down his left arm. (*Id.* at 79) Dr. Nicastro noted moderate bilateral neural foraminal stenosis and occasional left knee pain

---

[5] Dr. Nicastro is From's primary care physician. (D.I. 8-6 at 50)

which worsened with activity. (*Id.*) An MRI dated March 21, 2014 described normal cervical spine alignment, vertebral body heights, and no spinal cord abnormalities. (*Id.* at 87) On May 3, 2015, From fell, landing on his left knee, and visited Dr. Nicastro the following day due to his worsening knee pain. (D.I. 8-11 at 3) From regularly went to physiotherapy throughout the remainder of 2015. (D.I. 8-10 at 84; D.I. 8-12 at 22-66)

On May 13, 2015, From consulted Mr. Joseph Kelly, OT/L CHT ("Mr. Kelly"), who conducted a Disability Work Assessment and determined that From was able to safely work within the sedentary work category. (D.I. 8-10 at 3-4) Mr. Kelly concluded that From had limitations in standing, walking, lifting, carrying, and balancing activities and was limited to "no more than four hours per day with frequent breaks in an eight hour day." (*Id.* at 4) Furthermore, Mr. Kelly observed that From was unable to complete the balance test safely, complained that he felt dizzy when climbing stairs, could not complete the kneeling activity due to pain in his left knee, and had difficulty squatting and required assistance to stand. (*Id.* at 8) Dr. Nicastro signed the Disability Work Assessment, indicating his agreement with Mr. Kelly's assessment. (*Id.* at 10)

## 2. Mental Impairments

On March 14, 2014, From visited Dr. Nicastro, who observed his worsening depression, panic attacks, and insomnia. (D.I. 8-8 at 71) Dr. Nicastro also noted that From reported depression, repeated panic attacks, and insomnia at his May 5, 2014 appointment. (*Id.* at 79)

In June 2014, From consulted Dr. Andrew Donohue ("Dr. Donohue"),[6] who performed a consultative mental status examination to assess the severity of From's mental impairments.

---

[6] Dr. Donohue is a Doctor of Osteopathic Medicine who From visited once for the completion of a Delaware Disability Determination Service mental health report. (D.I. 8-9 at 45-49)

4

(D.I. 8-9 at 43-45) Dr. Donohue observed that From had no degree of impairment or mild impairment in all areas, with the exception of a moderate limitation in performing repetitive tasks. *(Id.* at 43-44) Furthermore, Dr. Donohue noted that From scored a 30/30 on the Mini-Mental State Examination ("MMSE").[7] *(Id.* at 48) In summary, Dr. Donohue suggested that From's physical impairments are his main barrier to employment and recognized that From was doing better mentally than when he was employed full-time. *(Id.* at 44)

On June 26, 2014, State agency psychological consultant, Dr. Christopher King ("Dr. King"), assessed that From's mental status was normal, with "no indication of any memory deficits or concentration problems" and normal social skills. (D.I. 8-3 at 7) Dr. King concluded From's mental impairments were non-severe. *(Id.)* Dr. King's assessment was affirmed on November 18, 2014 by Dr. Carlene Tucker-Okine ("Dr. Tucker-Okine"), a State agency psychological consultant, who concluded that From's symptoms were "well controlled with medication" and that he appeared to be stable. *(Id.* at 21)

Dr. Nicastro referred From to Mr. Keith Kaut, LPCMH ("Mr. Kaut")[8] at Mid-Atlantic Behavioral Health.[9] (D.I. 8-13 at 3) On February 9, 2015, From visited Mr. Kaut and reported that he had good days and bad days with his depression and anxiety. *(Id.* at 6) Mr. Kaut opined that From's mental impairments were moderately severe and only interfered with some daily activities. *(Id.)* At his appointments on March 9 and 23, 2015, From reported improved anxiety

---

[7] The MMSE is an assessment of cognitive functioning and is used to determine the impairment of memory and other mental skills. *See Mild Cognitive Impairment (MCI),* MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/mild-cognitive-impairment/diagnosis-treatment/drc-20354583 (last visited May 20, 2019).

[8] From regularly visits Mr. Kaut at Mid Atlantic Behavioral Health for his depression and anxiety. (D.I. 8-2 at 42, 44)

[9] Mr. Kaut intermittently refers to Dr. Nicastro as "Dr. DiCastro" in his meeting notes. (D.I. 8-13 at 3)

5

but continued symptoms of depression. (*Id.* at 12, 15) On April 6, 2015, From stated that his anxiety continued to improve, but that his depression was worse. (*Id.* at 19) Mr. Kaut observed that From was "tangential," talking at length without pause. (*Id.* at 20) At his next appointment on April 20, 2015, From stated that he had experienced two panic attacks in the last week. (*Id.* at 23) On May 18, 2015, From stated that he felt better "emotionally and mentally." (*Id.* at 31) He continued to report feeling better through August 2015, even noting that he had not experienced bouts of anxiety. (*Id.* at 43-62)

On June 29, 2015, Mr. Kaut completed a Mental Impairment Questionnaire, and noted that From had largely no or mild functional limitations, with the exception of moderate difficulty in maintaining concentration, persistence, or pace. (D.I. 8-10 at 12-17) Furthermore, Mr. Kaut determined that From was not seriously limited in mental abilities needed to perform unskilled, semiskilled, and skilled work. (*Id.* at 14-15) Mr. Kaut also noted that From's impairments would not cause him to be absent from work. (*Id.* at 16)

On August 24, 2015, From visited Mr. Kaut and suggested that he felt about the same, but that he had good days and bad days. (D.I. 8-13 at 59) Mr. Kaut suggested that From be evaluated for bipolar disorder and noted that he had been forgetful lately. (*Id.* at 60) On September 21, 2015, From reported only a few anxiety attacks and depressive spells, but "nothing too bad." (*Id.* at 63) On October 5, 2015, From stated that he had not dealt with anxiety "for some time now," though his depression was about the same. (*Id.* at 67)

In November 2015, From reported that he felt worse, but attributed this feeling to the upcoming holidays. (*Id.* at 71-78) On December 14, 2015, From stated that he did not suffer from panic attacks like he previously had, but still suffered with depression. (*Id.* at 79) On January 11, 2016, From reportedly felt better, but stated that he felt worse during his

6

appointment on January 25, 2016. (D.I. 8-14 at 4-11) By February 24, 2016, From stated that he "felt better mentally than [he] had in a long time" after quitting his job. (*Id.* at 12-19) This reported improvement in his mental health continued through June 2016, despite still experiencing some occasional bad days. (*Id.* at 20-47)

In June 2016, From noted that his depression had worsened because of his increased neck and knee pain. (*Id.* at 48) At his next appointment on July 13, 2016, From expressed that he was feeling much better, and Mr. Kaut noted that From was working on positive thinking. (*Id.* at 52-53) On August 10, 2016, From relayed that he experienced fewer symptoms of anxiety, and that his depression comes and goes. (*Id.* at 59) He felt largely the same in September 2016. (*Id.* at 67)

On September 7, 2016, Mr. Kaut completed a second Mental Impairment Questionnaire, but repeatedly noted that his determinations were based upon From's self-reporting and not upon clinical findings. (D.I. 8-10 at 95-98) In this Mental Impairment Questionnaire, Mr. Kaut indicated that From was "seriously limited" in his ability to ask simple questions or request assistance and set realistic goals or make plans independent of others. (*Id.* at 95-96) Mr. Kaut indicated that From had "poor" abilities in: (1) accepting instructions and responding appropriately to criticism from supervisors, (2) responding appropriately to changes in a routine work setting, (3) dealing with the stress of skilled and semiskilled work, (4) interacting appropriately with the general public, and (5) traveling in an unfamiliar place. (*Id.*) Furthermore, Mr. Kaut found From had moderate limitations in daily activities, marked limitations in maintaining social functioning, and extreme limitations in maintaining concentration, persistence, or pace. (*Id.* at 97) Finally, Mr. Kaut opined that From would be absent from work once per month due to his impairments. (*Id.*)

## C. Hearing Before the ALJ

### 1. From's Testimony

At the hearing on October 12, 2016, From testified that he worked for the Delaware Transit Company as a maintenance supervisor and part-time at the YMCA, advising individuals how to operate gym equipment. (D.I. 8-2 at 38-40) He stopped working because of "severe neck troubles," which he later learned to be a herniated disk. (*Id.* at 40) He also worked at Advanced Auto Parts, driving and delivering parts. (*Id.* at 50) He testified that he stopped working because his medications made him drowsy, and he did not feel safe driving after taking them. (*Id.* at 45-46, 51) Finally, From worked approximately sixteen hours per week at Rhino Lining, selling auto parts. (*Id.* at 52) He testified that due to his pain and anxiety, he had to stop working at Rhino Lining. (*Id.*)

From testified that he generally experiences pain daily and walks with a limp due to pain in his knee. (*Id.* at 40-41) From also testified that it was painful for him to stand for extended periods of time and he sometimes experiences numbness in his arm. (*Id.* at 45-46) He stated that he occasionally experiences spasms in his lower back and pain radiating down his left arm, out to his fingers, and in his feet. (*Id.* at 42) From stated that physical therapy helps his neck and knee. (*Id.* at 40-41) He testified that he "[doesn't] seem to have [anxiety]" but still struggles with depression. (*Id.* at 42)

From testified that he works part-time at Adam's Auto Parts, receiving deliveries and stocking supplies. (*Id.* at 43, 51, 53) He works approximately sixteen to eighteen hours per week and lifts no more than twenty-five pounds. (*Id.* at 43) From stated that he is able to end his work day at any point, but usually does not receive breaks. (*Id.* at 43-44)

From testified that he is no longer able to play golf or run on a treadmill. (*Id.* at 53-54)

He also stopped volunteering at the Ronald McDonald House because he believed the side

effects of his medication made it unsafe for him to drive. (*Id.* at 54)

### 2. Vocational Expert's Testimony

The ALJ posed the following hypothetical to the vocational expert ("VE"):

I want you to assume that you're dealing with an individual the same age as the
claimant – he's now 59 – with the same high school educational background and
the same past work experience. I want you to begin by assuming that this
individual retains the residual functional capacity for medium work but would be
incapable of climbing ladders, ropes, or scaffolds or performing work at
unprotected heights. Could this individual perform any past work?

(*Id.* at 56-57) The VE testified that this individual would be able to perform the work of a

mechanic supervisor as it is typically performed, but not as From performed it. (*Id.* at 57)

The ALJ inquired whether adding the limitation of only occasional overhead reaching

would affect the ability to perform past work. (*Id.*) The VE testified that this additional factor

would not have an impact on past work as typically performed. (*Id.*) The ALJ further inquired

whether adding the limitation of only occasional handling would affect the ability to perform

past work. (*Id.* at 58) The VE testified that this additional factor would rule out past work both

as performed and as recognized in the Dictionary of Occupational Titles ("DOT"). (*Id.*)

From's attorney asked the VE if the individual would be able to perform past work if the

individual's pain caused them to be "off task" by fifteen percent. (*Id.*) The VE testified that this

factor would rule out past work. (*Id.*)

9

## D. The ALJ's Findings

Based on the factual evidence in the record and the testimony of From and the VE, the

ALJ determined that From was not disabled under the Act for the relevant time period from May

31, 2013, the alleged onset date of his disability, through February 9, 2017, the date of the

decision. (*Id.* at 27) The ALJ found, in pertinent part:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.

2. The claimant has not engaged in substantial gainful activity since May 31, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease, degenerative joint disease, and obesity (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work, as defined in 20 CFR 404.1567(c) with the following limitations: no climbing ladders, ropes, or scaffolds; no work at unprotected heights; and only occasional overhead reaching.

6. The claimant is capable of performing past relevant work as a mechanic supervisor. This work does not require the performance of work-related activities precluded by the claimant's residual functioning capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from May 31, 2013, through the date of this decision (20 CFR 404.1520(f)).

(*Id.* at 18-27)

## III.   STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if

they are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (2015).

Judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the court must affirm the ALJ's decision if it is supported by substantial evidence. *See id.* at 1190-91.

Substantial evidence is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (quoting *Jesurum v. Sec'y of the U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995)). As the United States Supreme Court has explained, substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation marks omitted).

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If "reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See id.* at 250-51 (internal citations omitted). Thus, in the context of judicial review under § 405(g):

[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion.

*Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of a

11

claimant's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefits cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without a remand to the [Commissioner] for a rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### A. Disability Determination Process

The core issue in this case is whether From was disabled within the meaning of the Act at any time from May 31, 2013, the alleged onset date, through the date of the ALJ's decision, February 9, 2017. (D.I. 8-2 at 27) Title II of the Social Security Act affords insurance benefits "to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987) (citing 42 U.S.C. § 423(a)(l)(D) (2015)). A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(l)(A). A claimant is only disabled if his impairments are so severe that he is unable to do his previous work or engage in any other kind of substantial gainful work existing in the national economy. *See id.* § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-

12

22 (2003). To qualify for disability insurance benefits, a claimant must establish that he was disabled prior to the date he was last insured. *See* 20 C.F.R. § 404.131 (2016); *Matullo*, 926 F.2d at 244.

The Commissioner must perform a five-step analysis to determine whether a person is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If the Commissioner makes a finding of disability or non-disability at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)(i). At step one, the Commissioner determines whether the claimant is engaged in any substantial gainful activity. *See id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. *See id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, at step three, the Commissioner compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches a listed impairment, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to step four and five. *See id.* §§ 404.1520(e), 416.920(e).

At step four, the ALJ considers whether the claimant retains the residual functional capacity (the "RFC") to perform his past relevant work. *See id.* §§ 404.1520(a)(4)(iv),

13

416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001). The claimant bears the burden of demonstrating the inability to return to past relevant work. *See Plummer*, 186 F.3d at 428.

If the claimant is unable to return to past relevant work, at step five, the Commissioner must demonstrate that the claimant's impairments do not preclude him from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Plummer*, 186 F.3d at 428. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether he or she is capable of performing work and is not disabled. *See id.* The ALJ often seeks the VE's assistance in making this finding. *See id.*

## B. Whether the ALJ's Decision is Supported by Substantial Evidence

On February 9, 2017, the ALJ found From was not disabled within the meaning of the Act from the alleged onset date of May 31, 2013 through the date of the hearing. (D.I. 8-2 at 27) The ALJ concluded that, despite From's severe impairments (degenerative disc disease, degenerative joint disease, and obesity), he had the RFC to perform medium work[10] with the following limitations: no climbing ladders, ropes, or scaffolds; no work at unprotected heights;

---

[10] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c).

14

and only occasional overhead reaching. (*Id.* at 21) Based on this RFC determination, the ALJ concluded that From was able to perform past relevant work as a mechanic supervisor as generally performed. (*Id.* at 26)

From asserts two main arguments on appeal: (1) the ALJ erred by failing to apply the *de minimis* step two standard with respect to From's anxiety and depression and failing to account for these mental impairments in his ultimate RFC finding; and (2) the ALJ erred by failing to consider From's Functional Capacity Evaluation ("FCE") results and his treating physician's opinion. (D.I. 11 at 3)

### 1. From's Mental Impairments

From contends that the ALJ erred in assessing the severity of From's anxiety and depression by failing to apply the *de minimis* standard to his anxiety and depression. (*Id.* at 4-10) From argues that this severity determination erroneously led the ALJ to eliminate his mental impairments from consideration when determining his RFC. (*Id.* at 8) From notes that in making a disability determination when a claimant has a nonexertional limitation, the ALJ must "(1) take or produce vocational evidence such as from a vocational expert, the DOT or other similar evidence (such as a learned treatise); or (2) provide notice that we intend to take or are taking administrative notice of the fact that the particular nonexertional limitation(s) does not significantly erode the occupational job base, and allow the claimant the opportunity to respond before we deny the claim" or "rely on . . . an SSR to support our finding that jobs exist in the national economy that the claimant can do." AR 01-1(3), 2001 WL 65745 (Jan. 25, 2001). Therefore, if there are "credibly established nonexertional limitations," the ALJ is "required to rely on more than just the grids themselves in making her [RFC] determination." *Whitmore v. Barnhart*, C.A. No. 05-190-SLR, 469 F. Supp. 2d 180, 192 (D. Del. 2007); *see also Garrett v.*

*Comm'r of Soc. Sec.*, 274 F. App'x 159, 163 (3d Cir. 2008) ("[T]he ALJ need only include in the RFC those limitations which he finds credible.").

In *Whitmore*, this court granted the claimant's motion for summary judgment because the ALJ erroneously determined the claimant's complaints of subjective pain and fatigue were not credible, despite substantial evidence to the contrary. *Id.* at 193. As a result, the ALJ relied exclusively on Medical-Vocational guidelines set forth in the Regulations, despite claimant's "credibly established nonexertional limitations," thereby running afoul of AR 01-1(3). *Id.* at 192.

The present case is distinguishable from *Whitmore* in that substantial evidence supports the ALJ's non-severe mental impairment finding. The ALJ's residual functional capacity assessment reflects the degree of limitation he found in the "paragraph B" mental function analysis. Contrary to From's claims, the ALJ performed a thorough review of the medical records, the Agency consultants' assessments, and the evidence of record, and included all limitations he found credible in his RFC finding. The ALJ considered the "paragraph B" criteria, and found no limitations in any of the four functional areas:

- The first functional area is understanding, remembering or applying information. In this area, the claimant has no limitation.
- The next functional area is interacting with others. In this area, the claimant has no limitation.
- The third functional area is concentrating, persisting, or maintaining pace. In this area, the claimant has no limitation.
- The fourth functional area is adapting or managing oneself. In this area, the claimant has no limitation.

(D.I. 8-2 at 19-20) The ALJ explained that the limitations identified in the "paragraph B" criteria are not the RFC assessment but are rating criteria used in steps two and three of the sequential evaluation process. (*Id.* at 20) The RFC assessment in step four reflects the degree of limitation he found in the "paragraph B" mental function analysis. (*Id.*)

The ALJ considered From's description of his mental impairments, which included a limited attention span and memory impairments due to his anxiety and depression. (*Id.* at 26) The ALJ stated that From's description and medical records "indicate inconsistencies and exaggerations with respect to his limitations, which weakens the persuasiveness of his testimony." (*Id.* at 25) Specifically, the ALJ found that From's claimed ability to only pay attention for twenty minutes was inconsistent with his activities of daily living, and his alleged memory impairment was inconsistent with his score of 30/30 on the MMSE. (*Id.* at 26)

The ALJ gave little weight to the opinion of Mr. Kaut, who found several impairments in From's work-related areas due to limited attention, difficulty in carrying out detailed instructions, and difficulty in interacting with supervisors, co-workers, and the general public. (*Id.* at 24) From's medical record and non-medical factors was consistent with fewer limitations. The ALJ indicated that From worked four to five hours per day, volunteered, and maintained regular social contact with friends. (*Id.*) Importantly, From's depression, anxiety, and ADD "are longstanding and did not preclude full-time work in the past despite being present at relatively . . . similar levels." (*Id.*)

The ALJ gave great weight to Dr. King and Dr. Tucker-Okine, State agency psychological consultants. (*Id.*) The ALJ found that these assessments were consistent with medical records and From's activities of daily living. (*Id.*) The ALJ noted that From's mental impairments had not precluded full-time work in the past. (*Id.*) Furthermore, the ALJ stated that From had a long history of being treated with Xanax and valium, "so any prescription medication side effects were not work preclusive before his alleged disability onset date." (*Id.*)

From argues that according these examiners great weight was improper because they never examined From and did not have the opportunity to review Dr. Kaut's opinion or

additional treatment records. (D.I. 11 at 7) However, "State agent opinions merit significant consideration" because they are "experts in the Social Security disability programs." *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) (citing SSR 96-6p[11]). Moreover, the Third Circuit has observed that "there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Id.*

The ALJ found the non-severe mental health impairment assessment was further supported by non-medical factors such as From's activities of daily living, score of 30/30 on the MMSE, ability to handle money, and From's own report of having "no problems getting along with others." (D.I. 8-2 at 19-20) "An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a). "[T]he Regulations actually prohibit the ALJ from including plaintiff's non-severe mental state as a limitation in the hypothetical." *Robison v. Barnhart*, 316 F. Supp. 2d 156, 166 (D. Del. 2004). The ALJ noted that From's activities of daily living included part-time work, volunteering, caring for a dog, playing golf, watching sports, cutting the grass, doing laundry, reading newspapers, interacting with friends on Facebook, shopping, driving, and socializing. (*Id.*) Accordingly, substantial evidence supports the ALJ's conclusion that "[b]ecause the claimant's medically determinable mental impairments cause no more than mild limitation in any of the four functional areas, they are nonsevere (20 CFR 404.1520a(d)(1))."

---

[11] SSR 96-6p was rescinded and replaced by SSR 17-2p, which still recognizes that "[State agency Medical Consultants] and [Psychological Consultants] are highly qualified medical sources who are also experts in the evaluation of medical issues in disability claims under the Act." SSR 17-2p, 2017 WL 3928306 (Mar. 27, 2017).

18

(*Id.* at 20) Thus, substantial evidence supports the ALJ's conclusion that From's mental limitations were non-severe and the ALJ's assessment of From's RFC was proper.

Therefore, From's request to remand for further consideration of his mental limitations on his ability to perform past relevant work is denied.

## 2. Opinion of From's Treating Physicians

From argues that the ALJ erred when he failed to properly consider and give proper weight to the Disability Work Assessment,[12] which was conducted by Mr. Kelly and signed by Dr. Nicastro. (D.I. 11 at 10-19) Furthermore, From argues that the ALJ discredited the Disability Work Assessment based on his own lay analysis of the raw medical data, and did not evaluate the medical opinion pursuant to 20 C.F.R. § 404.1527(c) factors, which include: examining relationship, treating relationship, supportability, consistency, and specialization. (*Id.* at 14)

The court finds that the ALJ properly evaluated the Disability Work Assessment. Although the findings and opinions of treating physicians are entitled great weight, "the ALJ is not bound by the treating physician's opinion." *Parker v. Barnhart*, 244 F. Supp. 2d 360, 369 (D. Del. 2003). "The opinion may be rejected if it is inconsistent with other substantial evidence." *Id.*; *see also* 20 C.F.R. § 404.1527(c)(2).

The ALJ assigned "little weight" to the Disability Work Assessment conducted by Mr. Kelly and signed by Dr. Nicastro.[13] (D.I. 8-2 at 24) The ALJ asserted that such restrictive limitations of sedentary work for four hours a day with postural limitations were inconsistent with the evidence of record. (*Id.*) The ALJ explained that From's activities of daily living

---

[12] From refers to the Disability Work Assessment as the "Functional Capacity Evaluation (FCE)." (D.I. 8-10 at 3)

[13] The ALJ refers to Dr. Nicastro as "Dr. Oswald." (D.I. 8-2 at 24)

19

consisted of part-time work at the medium to heavy exertional level, volunteering, golfing regularly until 2015, cutting grass, driving, shopping, and going to the YMCA. (*Id.*) Moreover, the ALJ recognized that an MRI of From's cervical spine did not identify nerve root compromise, and From reported improvements due to physical therapy. (*Id.*) Therefore, substantial evidence supports the ALJ's decision to assign less weight to the Disability Work Assessment.

From also argues that by rejecting the Disability Work Assessment, the ALJ impermissibly substituted his own lay judgment for the opinions of medical experts. (D.I. 11 at 18) An ALJ is not bound to accept the opinion of a medical expert, but may weight the medical evidence and draw his or her own inferences. *Kertesz v. Crescent Hills Coal Co.*, 788 F.2d 158, 163 (3d Cir. 1986); *see also Brown v. Astrue*, 649 F.3d 193, 196 (3d Cir. 2011). However, the ALJ may not exercise absolute discretion to credit and discredit the expert's medical evidence, or to substitute his or her own lay judgment for the opinions of a medical expert. *Kertesz*, 788 F.2d at 163. Here, the ALJ did not substitute his own lay judgment for the opinions of Mr. Kelly and Dr. Nicastro, but rather noted that their opinions were inconsistent with the evidence of record and From's activities of daily living. (D.I. 8-2 at 24) The ALJ set forth valid reasons for according the Disability Work Assessment reduced weight.

Furthermore, the ALJ relied on the opinions of physicians employed by the State Disability Determination Services, Dr. Michael Borek ("Dr. Borek") and Dr. Darrin Campo ("Dr. Campo"). (*Id.* at 23) The ALJ afforded the opinions of Dr. Borek and Dr. Campo "some weight" although they were non-examining physicians because they had "a high level of understanding of the Social Security disability program and enjoy[ed] a review of all the available evidence in the record when forming their opinions." (*Id.*) From argues that affording

20

the opinions of Dr. Borek and Dr. Campo greater weight than Dr. Nicastro, his treating physician, was improper under SSR 96-6p because Dr. Borek and Dr. Campo did not have access to the entire record before the ALJ. (D.I. 11 at 17) However, as the court concluded in section (IV)(B)(1) *supra*, the lapse of time between the consultant's report and the ALJ's hearing and decision does not disqualify the report from the ALJ's consideration. *See Chandler*, 667 F.3d at 361.

Because the ALJ was within his authority to assign little weight to Mr. Kelly's and Dr. Nicastro's opinions, From's request for remand on this subject is denied.

## V. CONCLUSION

For the foregoing reasons, From's motion for summary judgment is denied (D.I. 10), and the Commissioner's cross-motion for summary judgment is granted (D.I. 16). An Order consistent with this Memorandum Opinion shall issue.

Dated: May 24 , 2019

Sherry R. Fallon
United States Magistrate Judge